1 | **REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
2 | mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
3 | adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
4 | Newport Beach, CA 92660
Phone:  (949) 975-0512
5 | Fax: (949) 208-2839

6 | **LIFSHITZ & MILLER**
Edward W. Miller (*Pro Hac Vice to be submited*)
7 | edmiller@aol.com
821 Franklin Ave., Suite 209
8 | Garden City, NY 11530
Phone: (516) 493-9780
9 | Fax: (516) 280-7376

10 | Attorneys for Plaintiff

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

13 |

JEREMY SAWYER, Derivatively on Behalf of Nominal Defendant LENDINGCLUB CORPORATION,

Plaintiff,

v.

SCOTT SANBORN, JOHN C. MORRIS, JOHN J. MACK, MARY MEEKER, LAWRENCE SUMMERS, SIMON WILLIAMS, DANIEL CIPORIN, JEFFREY CROWE, TIMOTHY J. MAYOPOULOS, RENAUD LAPLANCHE, and CARRIE DOLAN,

Defendants,
and,

LENDINGCLUB CORPORATION,

Nominal Defendant.

Case No:  3:17-cv-06447

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**Demand for Jury Trial**

Plaintiff Jeremy Sawyer (Plaintiff"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant LendingClub Corporation ("LendingClub" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by LendingClub and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on LendingClub's website; (c) review of the pleadings and other documents in the securities class action captioned *In re LENDINGCLUB SECURITIES LITIGATION*, Case No. 3:16-cv-02627-WHA (N.D. Cal.) (the "Securities Class Action"); and (d) review of other publicly available information concerning LendingClub and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant LendingClub against certain of the Company's current and former executive officers and directors seeking to remedy the Defendants' violations of the Exchange Act for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately April 24, 2015 to the present (the "Relevant Period").[1]

2.     LendingClub purports to operate as an online marketplace that "matches" borrowers and investors.  LendingClub facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors (*i.e.*, "lenders") an opportunity to invest in loans based on term and credit characteristics.

3.     LendingClub's borrowers apply on its website and are then matched with a lender or multiple lenders who can fund entire loans, portions of individual loans, and/or portions of pools of

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately April 24, 2015 to May 6, 2016; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

loans. In order to avoid state banking regulations, LendingClub then uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to LendingClub (at a price that includes modest fees and interest).  LendingClub buys these loans with the money from its "matched" lenders, and then services the loans, for which LendingClub receives an initial origination fee and then servicing fees on each payment throughout the term of the loan.

4.     On or about December 11, 2014, the Company completed its initial public offering ("IPO"), selling 59,000,000 shares of common stock along with certain stockholders who also sold an additional 7,700,000 shares of the Company's common stock for $15.00 per share, including shares offered in a 30-day option period to the underwriters of the IPO, for aggregate proceeds of approximately $1 billion.

5.     Throughout the Relevant Period, Defendants caused the Company to issue false and misleading statements and/or omit material information concerning the Company's business, including, that: (a) LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix Capital, L.P. ("Cirrix"), which acquired $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub; (b) LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and (c) weaknesses in LendingClub's internal controls meant that defendant Renaud Laplanche ("Laplanche") and other senior managers were able to and did engage in undisclosed related-party transactions, sell nonconforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

6.     The truth began to emerge on or about May 9, 2016, when the Company disclosed that its public filings contained falsified data concerning millions of dollars in loans, and that three senior managers had been involved in a $22 million sale of loans to an investor (who was later identified as the Jeffries Group), where the quality of loans LendingClub had provided was "in contravention of the investor's express instructions" regarding loan quality.  The Company also later disclosed that defendants Laplanche and John J. Mack ("Mack") had non-disclosed personal interests in Cirrix.

7.     As a result of the above, the Company disclosed that it suffered from "material weaknesses in internal control over financial reporting," which had manifested in undisclosed self-dealing sales of non-conforming loans and backdated loan applications.

8.     LendingClub's reputation suffered greatly since Defendants had for years claimed that the Company was a neutral market maker that was not taking on credit risk, when in fact LendingClub had actually become its own best prospect for new business taking on loans itself.

9.     Thereafter, defendant Laplanche was forced to resign, along with at least three other members of the Company's management.  LendingClub had to amend its annual report filed on Form 10-K with the SEC for the fiscal year 2015 in order to disclose the existence of the material weaknesses in its internal controls, which rendered all of its prior SEC filings wholly unreliable.

10.     On this news, the Company's stock plummeted from a close of $7.10 per share on May 6, 2016 to close at $4.62 per share on May 9, 2016, a loss of $2.48 per share, or approximately 35%, on unusually heavy volume of over 96 million shares.

11.     Director Defendant Mack did not disclose his interest in Cirrix to the Board.  None the less, defendant Mack remains on the Board and the Director Defendants (defined below) have taken no action against him.

12.     On May 25, 2017, the Court in the Securities Class Action denied in part three separate motions to dismiss, including one motion filed by the Securities Class Action Director Defendants.[2] *See In re LENDINGCLUB SECURITIES LITIGATION*, Case No. 3:16-cv-02627-WHA (N.D. Cal. May 25, 2017) (ORDER). Dkt. No. 181.  The surviving claims against the Director Defendants include claims that the Director Defendants misrepresented the adequacy of LendingClub's internal controls over financial reporting, failed to disclose the Company's relationship with Cirrix and misrepresented the Company's data integrity and security protocols in its registration statement for the IPO.

---

[2] The Securities Class Action Director Defendants include: Daniel T. Ciporin, Jeffrey Crowe, Rebecca Lynn, John J. Mack, Mary Meeker, John C. (Hans) Morris, Lawrence H. Summers and Simon Williams.  As such, seven of the nine current directors were named in the Securities Class Action and claims against those directors have survived an initial motion to dismiss.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market. This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the Defendants either resides in or maintains executive offices in this District and a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein occurred in this District. Further, LendingClub maintains an office in this District.

## THE PARTIES

16.     Plaintiff Jeremy Sawyer ("Plaintiff") purchased shares of LendingClub on March 25, 2015, has held shares of the Company during the time of the wrongdoing alleged herein, and has held shares of LendingClub continuously since that time.

17.     Defendant LendingClub Corporation is a Delaware corporation with its principal executive offices located at 71 Stevenson Street, Suite 300, San Francisco, California 94105.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LC."

18.     Defendant Scott Sanborn ("Sanborn") has been a director of the Company since 2016, the President since April 2016 and CEO since June 2016.  In his positions as President and CEO of the Company for the fiscal year ended December 31, 2016, defendant Sanborn received $11,361,139 in total compensation.  The Company admits that defendant Sanborn is not an independent director.

19.     Defendant John C. Morris ("Morris") has been a director of the Company since February 2013 and is the Chair of the Risk Committee.

20.     Defendant John J. Mack ("Mack") has been a director of the Company since April 2012 and is the Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

21.     Defendant Mary Meeker ("Meeker") has been a director of the Company since June 2012 and is a member of the Nominating and Corporate Governance Committee.

22.     Defendant Lawrence Summers ("Summers") has been a director of the Company since December 2012 and is a member of the Nominating and Corporate Governance Committee and the Risk Committee.

23.     Defendant Simon Williams ("Williams") has been a director of the Company since November 2014 and is the Chair of the Audit Committee and a member of the Risk Committee.

24.     Defendant Daniel Ciporin ("Ciporin") has been a director of the Company since August 2007 and is a member of the Audit Committee, Compensation Committee and the Risk Committee.

25.     Defendant Jeffrey Crowe ("Crowe") has been a director of the Company since August 2007 and is the Chair of the Compensation Committee and a member of the Audit Committee.

26.     Defendant Timothy J. Mayopoulos ("Mayopoulos") has been a director of the Company since August 2016 and is a member of the Audit Committee.

27.     Defendants Sanborn, Morris, Mack, Meeker, Summers, Williams, Ciporin, Crowe and Mayopoulos are collectively referred to herein as the "Director Defendants."

28.     Defendant Renaud Laplanche ("Laplanche") founded the Company and was a director and the CEO from October 2006 until May 5, 2016, when he was forced to resign.

29.     Defendant Carrie Dolan ("Dolan") was the Company's Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) ("CFO") from August 2010 until her resignation on August 2, 2016.

30.     The Director Defendants, nominal defendant LendingClub, defendants Laplanche and Dolan are collectively referred to herein as the "Defendants."

## BACKGROUND OF THE COMPANY

31.    LendingClub purports to operate as an online marketplace that "matches" borrowers and investors. LendingClub facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors (*i.e.*, "lenders") an opportunity to invest in loans based on term and credit characteristics.

32.    LendingClub's borrowers apply on its website and are then matched with a lender or multiple lenders who can fund entire loans, portions of individual loans, and/or portions of pools of loans. In order to avoid state banking regulations, LendingClub then uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to LendingClub (at a price that includes modest fees and interest). LendingClub buys these loans with the money from its "matched" lenders, and then services the loans. For its role, LendingClub receives an initial origination fee and then servicing fees on each payment throughout the term of the loan.

33.    On August 27, 2014, the Company filed a registration statement on Form S-1 with the SEC for the registration of the Company's securities in anticipation of its IPO. The registration statement was subsequently amended several times and declared effective by the SEC on or about December 11, 2014 (the "Registration Statement").

34.    On December 11, 2014, the Company filed its prospectus on Form 424B4 with the SEC in connection with IPO (the "Prospectus," together with the Registration Statement, the "Offering Documents").

35.    On December 16, 2014, the Company completed its IPO, in which it offered and sold 59,000,000 shares of common stock and certain stockholders offered and sold 7,700,000 shares of common stock at a price of $15.00 per share, including shares offered in a 30-day option period to the underwriters of the IPO, for aggregate proceeds of approximately $1 billion.

36.    In the Offering Documents, the Company emphasized the importance of loan originations to its financial results and stated, in pertinent part:

***Loan Originations***

***…We believe originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.[3]

37.    The Registration Statement also repeatedly emphasized the importance of transparency in the Company's reporting, which would purportedly be one of the competitive advantages of the Company:

***Benefits to Investors***

*        *        *

*Transparency*. We provide investors with transparency and choice in building their loan portfolios. For each standard program loan, investors can examine credit attributes from the borrower's credit report and borrower-reported attributes prior to investing in a loan and can monitor ongoing loan performance. We also provide access to credit profile data on each approved loan as well as all of the historical performance data for every loan ever invested in through our marketplace. We specifically indicate the information that is verified on our website.

38.    In the Registration Statement, defendant Laplanche (CEO at the time), included a letter to potential investors in which he further emphasized how LendingClub had established investor confidence through the Company's transparency with both borrowers and loan investors (the "Laplanche Letter").  The Laplanche Letter stated, in pertinent part:

I believe LendingClub has the potential to profoundly improve people's financial lives over the coming decades. Our mission of transforming the banking system is both audacious and achievable. Technology has successfully disrupted many industries to the benefit of society at large.

*        *        *

**Building Confidence**

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, we earn the trust of our customers by offering ***maximum transparency into our products'*** terms and performance.

---

[3] All emphasis added unless otherwise noted.

\*    \*    \*

We have established investor confidence by demonstrating the effectiveness of our risk ranking technology, as well as through the accuracy, ***transparency and granularity of our reporting***. We post on our platform the detailed performance of every single loan offered publicly to investors since inception, along with more aggregated performance statistics.

### Laplanche's Interest in Cirrix Capital, L.P.

39.     Cirrix was formed in 2012 for the sole purpose of purchasing loans from LendingClub. By the first quarter of 2016, Cirrix's loan purchases amounted to two-thirds of LendingClub's loan-origination growth.

40.     From the inception of Cirrix in 2012, LendingClub agreed to provide millions of dollars in credit support for the loans in which Cirrix invested – effectively shifting the risk of loss back to LendingClub.

41.     Essentially, LendingClub's relationship with Cirrix went as follows:
Cirrix buys loans that LendingClub sells. To boost its returns, Cirrix borrows from other banks to buy some of these loans. This creates a virtuous cycle for Lending Club: the more money Cirrix borrows, the more loans it can buy, and the more fees LendingClub collects.[4]

42.     Accordingly, "Lending Club CEO Renaud Laplanche failed to disclose a personal interest in Cirrix Capital, despite knowing that LendingClub was buying a 15% stake in the entity for $10 million." *See id.*

43.     Further, Cirrix's working partnership with LendingClub led to Silicon Valley Bank agreeing to lend Cirrix approximately three times the amount of capital it raised from investors.  This enabled Cirrix to leverage its capital such that each $1 million capital investment in Cirrix allowed Cirrix to turn around and purchase approximately $4 million worth of LendingClub loans.

44.     According to the Securities Class Action, defendant Mack was heavily involved with Cirrix at the time of the Company's IPO, and his financial stake in Cirrix, together with defendant Laplanche and LendingClub, reached over 30% during the Relevant Period.

45.     As a result of the relationships, partnerships and/or investments between Cirrix, LendingClub and defendant Mack, Cirrix was the only LendingClub loan investor that had access to

---

[4] Lauren Silva Laughlin, *How LendingClub's Scandal Echoes the Financial Crisis*, Fortune (May 10, 2016), *available at* http://fortune.com/2016/05/10/lendingclub-financial-crisis/.

all of the Company's loan programs, including private, public and small business loans.  Thus, defendants Laplanche and Mack personally benefitted from their Cirrix investments.

46.    The Laplanche Letter, as disclosed in the Registration Statement, further stated, in pertinent part:

> We are continuing to earn investor confidence every day by providing equal access and with [sic] a level playing field with the same tools, data and access for all investors, small and large, within a fair and efficient marketplace.

47.    By the time of the IPO, LendingClub's loans represented 100% of Cirrix's assets, and Cirrix's loan purchases drove LendingClub's pre-IPO results, representing 20% of LendingClub's critical loan-origination growth and nearly 5% of LendingClub's total sales of whole loans in the Company's last quarter before the IPO.  LendingClub has since disclosed that defendants Laplanche and Mack owned approximately 12% of Cirrix by the end of 2015, but has declined to reveal when their formal ownership stake first began.

48.    In addition, LendingClub also provided Cirrix with a credit-support agreement pursuant to which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).  As such, LendingClub had significant influence over Cirrix and *vice versa*.

49.    The Registration Statement also stated, in pertinent part:

> ***We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material***. The capital to invest in the loans enabled through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

50.    Despite the above statement in the Registration Statement that the Company did not assume credit risk or use its own capital to invest in loans facilitated by LendingClub's marketplace, for the third quarter of fiscal year 2014, the Company reported "***whole loan sales accounted for $367 million***" and steady loan-origination growth had reached 47%, representing purportedly impressive sales.

## The Company's Inadequate Security System

51.    In connection with the Company's security programs for information stored on the Company's platform, including access control and continuous monitoring programs to ensure data integrity and protect loan data from manipulation, the Registration Statement stated, in pertinent part:

Key elements of our technology include:

\*          \*          \*

*Data Integrity and Security.* ***We maintain an effective information security program based on well-established security standards and best*** *practices**, such as ISO2700x and NIST 800 series***. The program establishes policies and procedures to safeguard the confidentiality, *integrity* and availability of borrower and investor information. The program also addresses risk assessment, training, *access control*, encryption, service provider oversight, an incident response program and ***continuous monitoring and review.***

52.    The above statement concerning the Company's security was false and misleading because the Company's data programs and preventive controls were inadequate to ensure the integrity and security of information stored on the LendingClub platform. The Company eventually disclosed that its data programs and preventive controls were inadequate in May 2016, when the Company stated it "had not designed and implemented an additional level of review and approval for live database changes that impact high risk fields to provide reasonable assurance that all loans allocated comply with investor instructions."

53.    This deficiency allowed LendingClub's senior management to alter loan information in a live database to facilitate the sale of loans. Senior management's ability to change and manipulate information in live databases demonstrates the ineffectiveness of the Company's "Data Integrity and Security" program, and establishes that the Company's practices were not in fact "based on well-established security standards and best practices, such as ISO2700x and NIST 800 series."

54.    As a result of these deficiencies in "Data Integrity and Security" that existed from the effective date of the IPO, senior managers were able to alter loan information in a live database.

55.    As described further below, over $22 million in near prime loans were sold to an institutional investor when those loans did not meet that investor's known requirements. In addition, an outside consultant identified hundreds of backdated whole loan applications, representing another way Defendants were able to falsify the Company's performance, which was effectively drawing from a future reporting period to inflate present period performance.

**LendingClub's Inadequate Internal Controls**

56.     The Registration Statement incorporated the following statement from the section

entitled "Controls and Procedures" from the Company's quarterly report filed on Form 10-Q with the

SEC on November 5, 2014, which confirmed the adequacy of the LendingClub's internal controls over

its financial reporting, and stated in pertinent part:

> As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation,
> under the supervision and with the participation of management, including our Chief
> Executive Officer and Chief Financial Officer, of the effectiveness of the design and
> operation of our disclosure controls and procedures as of the end of the quarter covered
> by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial
> Officer have concluded that our disclosure controls and procedures were effective at a
> reasonable assurance level.

57.     The above statement was false and misleading because, as acknowledged by the

Company in May 2016, LendingClub had "material weaknesses" in its internal controls over financial

reporting.  In particular, in May 2016, the Company disclosed that its internal controls were

inadequate to provide reasonable assurances that:

   a.  the Company maintained an effective control environment, compliance with the

       Company's Code of Conduct and Ethics Policy, and set an appropriate "tone at the top";

   b.  related-party transactions were disclosed to the Company's reporting function;

   c.  the Company's loans conformed to loan investors' purchase requirements; and

   d.  there were full and required communications by management to LendingClub's risk and

       financial accounting departments, and appropriate oversight of investor contract

       amendments, particularly for those that could require material changes to LendingClub's

       financial statements.

58.     The Company also admitted that its internal controls had not changed over time and that

the same material weaknesses that existed at the time of the IPO were also present throughout the

Relevant Period.  The Company continued to make the same false and misleading representations

concerning its internal controls in its public filings throughout the Relevant Period, as described

below.

59.     The statements concerning the Company's internal controls were false and misleading as

they were inadequate throughout the Relevant Period.  In particular, as disclosed by the Company after

further review by the Board, in December 2009, defendant Laplanche artificially inflated loan origination volume by taking out thirty-two (32) loans for himself and three (3) of his family members, amounting to nearly 10% of LendingClub's market activity for the entire month. The Company disclosed in 2016 that these loans were made in order to "help increase reported platform loan volume."

60.     The Company's inadequate internal controls have persisted since prior to the IPO.  In the Company's quarterly report filed on Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"), the Company stated, in pertinent part:

> The investment assets held by the Funds are essentially loans facilitated through the Company's platform and are "level 3 assets", for which no quoted market price is available and whose fair value is therefore subjective and is determined by LCA estimates and calculations.

> The Company determined that adjustments were made to the valuation of the Funds' assets that were not consistent with generally accepted accounting principles. These adjustments affected the direction and the specific returns reported in monthly statements sent to limited partners.

61.     The "Funds," as described in the Q3 2016 10-Q, refers to LendingClub's subsidiary, LendingClub Advisors ("LCA").  LendingClub disclosed that it had improperly inflated net asset values for six private investment funds managed by LCA from March 2011 through May 2016 in violation of Generally Accepted Accounting Principles ("GAAP").

62.     By inflating the value of these assets in violation of GAAP, LendingClub reported inflated economic returns of the funds and overcharged limited partners.[5]

**The Company's Increased Reliance on Cirrix**

63.     By March 2015, Cirrix had purchased nearly $200 million in loans from LendingClub. During 2015, Cirrix purchased an additional $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.

---

[5] ASC 820-10-35-53 requires that the level 3 "[u]nobservable inputs [that defendants used, *i.e.*, the "direction and the specific returns reported in monthly statements"] shall reflect the assumptions that market participants would use when pricing the asset….including assumptions about risk." Furthermore, "[a] [fair value] measurement that does not include an [appropriate] adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset." ASC 820-10-35-54.

64.   Due to its declining returns, however, by early 2016, Cirrix required an additional capital infusion in order to continue purchasing LendingClub loans. Defendants Laplanche and Mack infused Cirrix with cash, as defendant Laplanche had secretly entered into arrangements whereby he could raise cash by using his LendingClub shares as collateral.  Defendant Mack also provided Cirrix with an infusion so it could continue to purchase more LendingClub loans and avoid a total collapse in LendingClub's marketplace. Then, without disclosing their personal interests, defendants Laplanche and Mack caused LendingClub's Board to approve a $10 million direct investment in Cirrix, so LendingClub could purchase more of its own loans. As of close of business on April 1, 2016, the Company and defendants Laplanche and Mack owned approximately 15%, 8%, and 8% of limited partnership interests in Cirrix, respectively, for an aggregate interest of approximately 31%.  At the same time, whole loans and interests in loans facilitated by LendingClub's platform comprised 100% of Cirrix's assets.

65.   This additional capital enabled LendingClub to continue using Cirrix to increase LendingClub's reported loan originations, revenues, and earnings per share ("EPS").  In fiscal 2015, LendingClub's fees from Cirrix amounted to 5% of its reported growth in servicing fees, and enabled LendingClub to double its EPS growth rate and slash its EPS losses by 50%.

66.   Likewise, in the first quarter of fiscal year 2016, Cirrix purchased $114.5 million in LendingClub whole loans, which was equal to 6% of LendingClub's whole loan originations. That same quarter, Cirrix's loan purchases amounted to 67% of LendingClub's loan-origination growth.

### February 24, 2015 Press Release and Form 8-K

67.   On February 24, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2014 financial results, which stated, in pertinent part:

**Fourth Quarter 2014 Financial Highlights**

**Originations – *Loan originations in the fourth quarter of 2014 were $1,415 million*,** compared to $698 million in the same period last year, an increase of 103% year-over-year. The LendingClub platform has facilitated loans totaling over $7.6 billion since inception.

**Operating Revenue** – Operating revenue in the fourth quarter of 2014 was $69.6 million, compared to $33.5 million in the same period last year, an increase of 108%

year-over-year. Operating revenue as a percent of originations, known as our "revenue yield", in the fourth quarter was 4.92%, up from 4.79% in the prior year.

**Adjusted EBITDA** – Adjusted EBITDA was $7.9 million in the fourth quarter of 2014, compared to $6.5 million in the same period last year.

**Net Income/Loss** - GAAP net loss was ($9.0) million for the fourth quarter of 2014, compared to a net income of $2.9 million in the same period last year. Lending Club's GAAP net loss included $11.3 million of stock-based compensation expense during the fourth quarter of 2014.

**Earnings (Loss) Per Share (EPS)** - Basic and diluted loss per share was ($0.07) for the fourth quarter of 2014 compared to EPS of $0.00 in the same period last year.

68.    In the February 24, 2015 press release and Form 8-K, defendant Laplanche, CEO at the time and founder of LendingClub, stated, in pertinent part, "2015 is going to be another investment year, and ***we intend to continue growing originations and revenue at a fast, yet deliberate pace***."

69.    Defendant Dolan, CFO of the Company at the time, also stated, "…***we intend to continue to execute on our strategy of fast yet disciplined growth***."

### **The 2014 Annual Report on Form 10-K**

70.    On February 27, 2015, the Company filed its annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"), which stated, in pertinent part:

In the fourth quarter of 2014, our marketplace facilitated over $1.4 billion of loan originations, of which approximately $0.2 billion were invested in through notes, $0.4 billion were invested in through certificates and $0.8 billion were invested in through whole loan sales.

\*     \*     \*

***We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material***. The capital to invest in the loans facilitated through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

71.    Further, under the section entitled "Controls and Procedures," the 2014 10-K stated, in pertinent part:

As required by Rule 13a-15(b) of the 1934 Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of

our disclosure controls and procedures as of December 31, 2014. **Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.**

72.   The 2014 10-K was signed by defendants Laplanche, Dolan, Crowe, Ciporin, Mack, Meeker, Morris, Summers and Williams.

73.   The 2014 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by defendants Laplanche and Dolan, which stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

74.   The SOX Certifications stated, in pertinent part:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures…; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## FALSE AND MISLEADING STATEMENTS AND/OR

## MATERIAL OMISSIONS MADE THROUGHOUT THE RELEVANT PERIOD

## 2015 Proxy Statement

75.   On April 24, 2015, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2015 annual meeting of shareholders (the "2015 Proxy").  The 2015 Proxy included a

1   section entitled "Report of the Audit Committee," which stated, among other things, that the Audit

2   Committee approved and recommended that the audited financial statements be included in the 2014

3   10-K.

4       76.    The 2014 10-K was false and misleading and/or omitted to disclose the material

5   information described above.

6       77.    In describing compensation for the Company's named executive officers, the 2015 Proxy

7   stated that, "[o]ur Board of Directors approved cash bonuses for 2014 for our executive officers,

8   including our NEOs, in order to reward our executive officers for achieving our financial and

9   operational goals."  In connection with the Company's purported successful performance, the 2015

10  Proxy stated that "non-equity plan incentive plan awards received for the fiscal year 2014 performance

11  period were $409,690, $180,558, $297,131, $170,158 and $110,741 for Mr. Laplanche, Ms. Dolan,

12  Mr. Sanborn, Mr. MacIlwaine and Ms. Chen, respectively."

13      78.    The statements described above in the 2015 Proxy were false and misleading because the

14  Company did not actually meet the "financial and operational goals" and purported successful

15  "performance" that caused Defendants to issue the above-described awards to certain of the

16  Defendants and/or other members of the Company's management.  Indeed, the Company's purported

17  performance was based on results reported by Defendants as a result of the Company's deficient

18  internal controls.  The Company's inadequate internal controls allowed Defendants to cause the

19  Company's financial statements to contain false and misleading statements concerning, among other

20  things, reported loan originations, loan originations growth, revenues/fees, and EPS due to undisclosed

21  related-party transactions with Cirrix; that LendingClub assumed material credit and liquidity risks,

22  including tens of millions of dollars in a credit-support agreement with Cirrix; and that LendingClub

23  engaged in undisclosed related-party transactions, sell nonconforming loans to investors, backdate

24  loan applications, which rendered inaccurate the Company's financial reporting.

25      79.    In the section of the 2015 Proxy entitled "Related Party Transactions," the 2015 Proxy

26  completely fails to disclose the related party interests of defendants Laplanche and Mack with Cirrix.

27  As a result, the 2015 Proxy is false and misleading because the section concerning related party

28  transactions fails to disclose that both defendants Laplanche and Mack owned an interest in Cirrix.

Therefore, the 2015 Proxy fails to disclose that LendingClub's sales of loans took place inorganically and that LendingClub took on a significant credit risk on Cirrix's behalf in the form of a credit-support agreement.  Further, LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix.

### May 2015 Press Release and Form 8-K

80.    On May 5, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial results for the first quarter of 2015, which stated, in pertinent part:

**First Quarter 2015 Financial Highlights**

**Originations** – Loan originations in the first quarter of 2015 were $1,635 million, compared to $791 million in the same period last year, an increase of 107% year-over-year. The Lending Club platform has now facilitated loans totaling roughly $9.3 billion since inception.

**Operating Revenue** – Operating revenue in the first quarter of 2015 was $81.0 million, compared to $38.7 million in the same period last year, an increase of 109% year-over-year. Operating revenue as a percent of originations, or our revenue yield, was 4.96% in the first quarter, up from 4.89% in the prior year.

**Adjusted EBITDA** – Adjusted EBITDA was $10.6 million in the first quarter of 2015, compared to $1.9 million in the same period last year. As a percent of operating revenue, Adjusted EBITDA margin increased to 13.1% in the first quarter of 2015, up from 4.8% in the prior year.

**Net Loss** – GAAP net loss was $6.4 million for the first quarter of 2015, compared to a net loss of $7.3 million in the same period last year. Lending Club's GAAP net loss included $11.6 million of stock-based compensation expense during the first quarter of 2015, compared to $7.0 million in the first quarter of 2014.

**Loss Per Share (EPS)** - Basic and diluted loss per share was ($0.02) for the first quarter of 2015 compared to EPS of ($0.13) in the same period last year.

**Adjusted EPS** – Adjusted EPS was $0.02 for the first quarter of 2015 compared to $0.00 in the same period last year.

**Cash and Cash Equivalents** - As of March 31, 2015, cash and cash equivalents totaled $874 million, with no outstanding debt.

### May 5, 2015 Quarterly Report on Form 10-Q

81.    Also on May 5, 2015, the Company filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"), which stated, in pertinent part:

In the first quarter of 2015, our marketplace facilitated $1.6 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.5 billion were invested in through certificates and $0.8 billion were invested in through whole loan sales.

*   *   *

We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans enabled through our marketplace comes directly from investors.

82.    Concerning loan originations, the Q1 2015 10-Q stated:

***Originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction ratings, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

83.    Under the section entitled "Controls and Procedures," the Q1 2015 10-Q stated:

The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of March 31, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2015***.

84.    The Q1 2015 10-Q was signed by defendants Laplanche and Dolan and contained signed SOX Certifications by defendants Laplanche and Dolan, which stated that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

85.    Later on May 5, 2015, the Company hosted a conference call for analysts and investors concerning the Company's first quarter 2015 financial results.  During the conference call, defendant Laplanche discussed the Company's success in originating new loans using a growth strategy that was predicated on "solid risk management," and further stated, in pertinent part:

While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation.

## August 4, 2015 Press Release and Form 8-K

86.    On August 4, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of 2015, which stated, in pertinent part:

### Second Quarter 2015 Financial Highlights

**Originations –** Loan originations in the second quarter of 2015 were $1.91 billion, compared to $1.01 billion in the same period last year, an increase of 90% year-over-year. The Lending Club platform has now facilitated loans totaling roughly $11.2 billion since inception.

**Operating Revenue –** Operating revenue in the second quarter of 2015 was $96.1 million, compared to $48.6 million in the same period last year, an increase of 98% year-over-year. Operating revenue as a percent of originations, or our revenue yield, was 5.03% in the second quarter, up from 4.83% in the prior year.

**Adjusted EBITDA –** Adjusted EBITDA was $13.4 million in the second quarter of 2015, compared to $4.0 million in the same period last year. As a percent of operating revenue, Adjusted EBITDA margin increased to 13.9% in the second quarter of 2015, up from 8.2% in the prior year.

**Net Loss –** GAAP net loss was $4.1 million for the second quarter of 2015, compared to a net loss of $9.2 million in the same period last year. Lending Club's GAAP net loss included $12.5 million of stock-based compensation expense during the second quarter of 2015, compared to $8.3 million in the second quarter of 2014.

**Loss Per Share (EPS) –** Basic and diluted loss per share was ($0.01) for the second quarter of 2015 compared to EPS of ($0.16) in the same period last year.

**Adjusted EPS –** Adjusted EPS was $0.03 for the second quarter of 2015 compared to $0.01 in the same period last year.

**Cash, Cash Equivalents and Securities Available for Sale –** As of June 30, 2015, cash, cash equivalents and securities available for sale totaled $888 million, with no outstanding debt.

87.    Also in the August 4, 2015 press release and Form 8-K, defendant Laplanche stated:

*We had another very strong quarter* with accelerating revenue growth from 17% to 19% quarter over quarter and expanding margins from 13.1% in Q1 to 13.9% in Q2…Strong platform effects, industry leading position, superior engineering, and record high customer satisfaction translating into a loyal repeat customer base, have helped us continue to lower our acquisition costs this quarter. These results and the continued momentum we are seeing give us the confidence to, once again, raise our outlook for the full year in terms of both growth and margins.

**August 5, 2015 Quarterly Report on Form 10-Q**

88.    On August 5, 2015, the Company filed its quarterly report on Form 10-Q with the SEC announcing its results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"), which stated, in pertinent part:

> In the second quarter of 2015, our marketplace facilitated $1.9 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.6 billion were invested in through certificates and $1.0 billion were invested in through whole loan sales.
>
> *              *              *
>
> We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans enabled through our marketplace comes directly from investors.

89.    Concerning loan originations, the Q2 2015 10-Q stated, in pertinent part:

> ***Originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction ratings, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

90.    Under the section entitled "Controls and Procedures," the Q2 2015 10-Q stated:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of June 30, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of June 30, 2015***.

91.    The Q2 2015 10-Q was signed by defendants Laplanche and Dolan and contained signed SOX Certifications by defendants Laplanche and Dolan, which stated that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

**The U.S. Department of Treasury Requests Information Concerning Marketplace Lending**

92.    On July 20, 2015, the U.S. Department of the Treasury issued a notice and request for information ("RFI") calling for "public input on expanding access to credit through online

marketplace lending," with submissions of responses and comments due on or before August 31, 2015.[6]

93.    On September 30, 2015, one month after responses were due, the Company issued a press release with the Company's full response to the Treasury Department's RFI.  Concerning the Company's assumption of credit risk, the Company's response stated, in pertinent part:

The Risks of Risk Retention

We believe there already is sufficient alignment of interest between credit marketplaces and investors and further alignment would be unnecessary. In fact, we believe that further alignment with investors could be counterproductive and contrary to borrowers' interest and the availability of affordable credit.

As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers). Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers. As an example, platform rates are set based on expectations of future loan performance and the balance of supply and demand on the platform. As investors showed strong appetite for the loans originated through our marketplace, we were able to lower interest rates to borrowers. Over the last three years, the risk premiums required by investors on Lending Club's platform have decreased by 270 basis points. If we invested our own capital and earned interest on a portion of the loans, our financial incentive would be to keep interest rates artificially high irrespective of what the balance of supply and demand would otherwise suggest. This situation would result in making credit more costly for consumers and small business owners.

(Footnote omitted).

**October 29, 2015 Press Release and Form 8-K**

94.    On October 29, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of 2015, which stated, in pertinent part:

**Third Quarter 2015 Financial Highlights**

**Originations –** Loan originations in the third quarter of 2015 were $2.24 billion, compared to $1.17 billion in the same period last year, an increase of 92% year-over-year. The Lending Club platform has now facilitated loans totaling over $13.4 billion since inception.

**Operating Revenue –** Operating revenue in the third quarter of 2015 was $115.1 million, compared to $56.5 million in the same period last year, an increase of

---

[6] *Available at* https://www.gpo.gov/fdsys/pkg/FR-2015-07-20/pdf/2015-17644.pdf.

104% year-over-year. Operating revenue as a percent of originations, or revenue yield, was 5.15% in the third quarter, up from 4.85% in the prior year.

**Adjusted EBITDA –** Adjusted EBITDA was $21.2 million in the third quarter of 2015, compared to $7.5 million in the same period last year. As a percent of operating revenue, Adjusted EBITDA margin increased to 18.4% in the third quarter of 2015, up from 13.3% in the prior year.

**Net Income –** GAAP net income was $1.0 million for the third quarter of 2015, compared to a net loss of $7.4 million in the same period last year. GAAP net income included $13.5 million of stock-based compensation expense during the third quarter of 2015, compared to $10.5 million in the prior year.

**Earnings Per Share (EPS) –** Basic and diluted earnings per share was $0.01 for the third quarter, compared to basic and diluted EPS of ($0.12) in the same period last year.

**Adjusted EPS –** Adjusted EPS was $0.04 for the third quarter of 2015, compared to $0.02 in the same period last year.

**Cash, Cash Equivalents and Securities Available for Sale –** As of September 30, 2015, cash, cash equivalents and securities available for sale totaled $918 million, with no outstanding debt.

95.     Also in the October 29, 2015 press release and Form 8-K, defendant Laplanche stated:

We had another spectacular quarter, with revenue growth re-accelerating from 98% to 104%, and EBITDA jumping 181% year-over-year to reach 18.4%…With over 1.2 million customers, continuously high customer satisfaction, strong credit performance, increased marketing efficiency and lower customer acquisition costs, we are continuing to observe tremendous network effects and benefits of scale. Our results this quarter combined with our raised Q4 outlook lead us to forecast a near doubling of revenue again this year and look toward 2016 with high confidence.

96.     Later on October 29, 2015, the Company hosted a conference call for analysts and investors concerning the Company's third quarter 2015 financial results.  During the conference call, defendant Laplanche assured investors of the Company's track record at building its customers' trust, and stated:

[I]n financial services, there's really no short cuts. It's not like some other consumer products where you can really connect the dots between awareness and sales. With financial services, reputation and trust is as important as just awareness. And so we're patiently building that reputation and that trust and I think the results of that already pretty visible in some of our metrics and I think will continue to unfold over time.

97.     Also during the October 29, 2015 conference call, regarding the diversity and "very broad appetite" of the Company's investor base and its ability to "manage the flow of both supply and demand," defendant Laplanche stated:

We think, again, that's a great benefit of the model now. That benefit will get even stronger in some different economic environments, especially as we go into the next cycle and we will show the resiliency [of] the very diverse investor database we've built very patiently over the last eight years. I think we've ha[d] a big competitive advantage over some of the newer platforms that, for the most part, have no retail investors and considerable concentration in investor base or strong reliance on the securitization markets, which really isn't our case at all.

98.    At the time of the October 29, 2015 conference call, defendant Laplanche and LendingClub's years' long use of Cirrix had reached hundreds of millions of dollars of related-party purchases of LendingClub loans.

### The November 3, 2015 Quarterly Report on Form 10-Q

99.    On November 3, 2015, the Company filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), which stated, in pertinent part:

In the third quarter of 2015, our marketplace facilitated $2.2 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.7 billion were invested in through certificates and $1.2 billion were invested in through whole loan sales.

\*        \*        \*

We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans enabled through our marketplace comes directly from investors.

100.   Concerning loan originations, the Q3 2015 10-Q stated, in pertinent part:

***Originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction ratings, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

101.   Under the section entitled "Controls and Procedures," the Q3 2015 10-Q stated:

The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of September 30, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of September 30, 2015***.

102.   The Q3 2015 10-Q was signed by defendants Laplanche and Dolan and contained signed SOX Certifications by defendants Laplanche and Dolan, which stated that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

103.   The statements made above from May 2015 to the Q3 2015 10-Q were materially false and misleading and/or omitted material information because: (a) LendingClub and defendants Laplanche and Dolan knew or recklessly disregarded that LendingClub's "tone at the top" was not one that emphasized best business practices or honest and complete disclosures; (b) LendingClub and defendant Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix; (c) LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and (d) LendingClub, Laplanche, and Dolan knew or recklessly disregarded that material weaknesses in LendingClub's internal controls meant that Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell nonconforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

### February 11, 2016 Press Release and Form 8-K

104.   On February 11, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial results for the fourth quarter and full year 2015, which stated:

**Fourth Quarter 2015 Financial Highlights**

**Originations** – Loan originations in the fourth quarter of 2015 were $2.58 billion, compared to $1.41 billion in the same period last year, an increase of 82% year-over-year. The LendingClub platform has now facilitated over $16.0 billion in loans since inception.

**Operating Revenue** – Operating revenue in the fourth quarter of 2015 was $134.5 million, compared to $69.6 million in the same period last year, an increase of 93% year-over-year. Operating revenue as a percent of originations, or revenue yield, was 5.21% in the fourth quarter, up from 4.92% in the prior year.

**Adjusted EBITDA –** Adjusted EBITDA was $24.6 million in the fourth quarter of 2015, compared to $7.9 million in the same period last year. As a percent of operating revenue, Adjusted EBITDA margin increased to 18.3% in the fourth quarter of 2015, up from 11.4% in the prior year.

**Net Income –** GAAP net income was $4.6 million for the fourth quarter of 2015, compared to net loss of $9.0 million in the same period last year. GAAP net income included $13.7 million of stock-based compensation expense during the fourth quarter of 2015, compared to $11.3 million in the prior year.

**Earnings Per Share (EPS) –** Basic and diluted earnings per share was $0.01 for the fourth quarter, compared to basic and diluted EPS of ($0.07) in the same period last year.

**Adjusted EPS –** Adjusted EPS was $0.05 for the fourth quarter of 2015, compared to $0.01 in the same period last year.

**Cash, Cash Equivalents and Securities Available for Sale –** As of December 31, 2015, cash, cash equivalents and securities available for sale totaled $921 million, with no outstanding debt.

105. Later on February 11, 2016, the Company hosted a conference call for analysts and investors concerning the Company's fourth quarter and full year 2015 financial results. During the conference call, defendant Laplanche engaged in the following exchange with analyst Vasu Govil of Morgan Stanley:

**Vasu Govil (Morgan Stanley)**

And just a quick follow-up. There has been some recent press articles floating around that suggest that Lending Club may be open to securitizing its own loans for the first time. Just want to track if there is appetite to do that? And if there is, what sort of balance sheet risk would that expose you guys to?

**Renaud Laplanche**

We are very attached to the marketplace model. We think it's a superior model than any other models. We have no intentions as a matter of business model, to start investing our own balance sheet and take balance sheet risks in our loans. As we said in the past, we can always use our balance sheet on a temporary basis for test programs, but this would always be a very small. Again, no change in the business model. What's going to continue to happen, is some of our investors on the platform can turn around and refinance themselves on the securitization [lockout] and we want to support them and do what's right for them.

### The 2015 Annual Report on Form 10-K

106. On February 22, 2016, the Company filed its annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"), which stated, in pertinent part:

Our business model is not dependent on using our balance sheet and assuming credit risk for loans facilitated by our marketplace. In order to support contractual obligations (Pool B loans), regulatory commitments (direct mail), the testing of pilot loan programs, or customer accommodations, we may use our capital on the platform from time to time on terms that are substantially similar to other investors.

\*   \*   \*

In 2015, our marketplace facilitated over $8.4 billion of loan originations, of which approximately $1.3 billion were invested in through notes, $2.6 billion were invested in through certificates and $4.5 billion were invested in through whole loan sales

107.   Under the section entitled "Controls and Procedures," the 2015 10-K stated:

As required by Rule 13a-15(b) of the 1934 Act, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures as of December 31, 2015. Based on the foregoing, the Company's Chief Executive Officer and Chief Financial Officer have concluded that its disclosure controls and procedures were effective at a reasonable assurance level.

108.   The 2015 10-K was signed by defendants Laplanche, Dolan, Crowe, Ciporin, Mack, Meeker, Morris, Summers and Williams and contained signed SOX Certifications by defendants Laplanche and Dolan, which stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

109.   The statements made above were materially false and misleading because: (a) LendingClub and defendants Laplanche and Dolan knew or recklessly disregarded that LendingClub's "tone at the top" was not one that emphasized best business practices or honest and complete disclosures; (b) LendingClub and defendant Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix; (c) LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and (d) LendingClub, Laplanche, and Dolan knew or recklessly disregarded that material weaknesses in LendingClub's internal controls meant that Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell nonconforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

110.   Furthermore, defendant Laplanche had formulated and induced the Board to approve a $150 million common stock buyback program in order to artificially inflate the price of LendingClub's stock and thereby avoid the investor scrutiny that would result therefrom.

## 2016 Proxy Statement

111.   On April 26, 2016, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2016 annual meeting of shareholders (the "2016 Proxy").  The 2016 Proxy included a section entitled "Report of the Audit Committee," which stated, among other things, that the Audit Committee approved and recommended that the audited financial statements be included in the 2015 10-K.

112.   The 2015 10-K was false and misleading and/or omitted to disclose the material information described above.

113.   In describing compensation for the Company's named executive officers, the 2016 Proxy stated that, "[o]ur Board of Directors approved cash bonuses for 2015 for our executive officers, including our NEOs, in order to reward our executive officers for achieving our financial and operational goals."  In connection with the Company's purported successful performance, the 2016 Proxy stated that "non-equity incentive plan awards received for the fiscal year 2015 performance period were $549,185, $231,000, $418,500, and $310,000 for Mr. Laplanche, Ms. Dolan, Mr. Sanborn, and Mr. MacIlwaine, respectively."

114.   The statements described above in the 2016 Proxy were false and misleading because the Company did not actually meet the "financial and operational goals" and purported successful "performance" that caused Defendants to issue the above-described awards to certain of the Defendants.  Indeed, the Company's purported performance was based on results reported by Defendants as a result of the Company's deficient internal controls.  The Company's inadequate internal controls allowed Defendants to cause the Company's financial statements to contain false and misleading statements concerning, among other things, reported loan originations, loan originations growth, revenues/fees, and EPS due to undisclosed related-party transactions with Cirrix; that LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and that LendingClub engaged in undisclosed related-party

transactions, sold nonconforming loans to investors, backdated loan applications, which rendered inaccurate the Company's financial reporting.

115.   In the section of the 2016 Proxy entitled "Related Party Transactions," the 2016 Proxy states, in pertinent part:

> At December 31, 2015, Mr. Laplanche and Mr. Mack owned approximately 2% and 10%, respectively, of limited partnership interests in a holding company that participates in a family of funds with other unrelated third parties, which purchase whole loans and interests in whole loans from the Company. During the year ended December 31, 2015, this family of funds purchased $139.6 million of whole loans and $34.9 million of interests in whole loans. During the year ended December 31, 2015, the Company earned $636,000 in servicing fees and $357,000 in management fees from this family of funds, and paid interest of $7.4 million to the family of funds. The sales of whole loans and interests in whole loans, and the servicing and management fees charged were on terms and conditions that were not more favorable than those obtained by other third-party investors.

> Subsequent to December 31, 2015, the Company invested $10 million for an approximate 15% limited partnership interest in the holding company and Mr. Laplanche invested an additional $4.0 million for an approximate 8% limited partnership interest in the holding company. The Risk Committee reviewed and approved the investment of $10 million in the holding company. As of close of business April 1, 2016, the Company, Mr. Laplanche and Mr. Mack owned approximately 31% of limited partnership interests in the holding company.

116.   Again, the 2016 Proxy failed to disclose defendants Laplanche's and Mack's interest in Cirrix, which was the only LendingClub loan investor that had access to all of the Company's loan programs, including private, public and small business loans.  Further, the 2016 Proxy failed to disclose that LendingClub also provided Cirrix with a credit-support agreement pursuant to which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).

### THE TRUTH BEGINS TO EMERGE

117.   On May 9, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing, among other things, that the Company accepted the resignation of Company founder defendant Laplanche as Chairman and CEO of LendingClub.

118.   The Company stated that defendant Laplanche's resignation "followed an internal review of sales of $22 million in near-prime loans to a single investor, in contravention of the investor's express instructions as to a non-credit and non-pricing element, in March and April 2016.  Concerning defendant Laplanche's resignation, the May 9, 2016 press release stated, in pertinent part:

**Board Review**

Lending Club conducted a review, under the supervision of a sub-committee of the board of directors and with the assistance of independent outside counsel and other advisors, regarding non-conforming sales to a single, accredited institutional investor of $22 million of near-prime loans ($15 million in March and $7 million in April). The loans in question failed to conform to the investor's express instructions as to a non-credit and non-pricing element. Certain personnel apparently were aware that the sale did not meet the investor's criteria.

In early April 2016, Lending Club repurchased these loans at par and subsequently resold them at par to another investor. As a result of the repurchase, as of March 31, 2016, these loans were recorded as secured borrowings on the Company's balance sheet and were also recorded at fair value. The financial impact of this reporting is that the Company was unable to recognize approximately $150,000 in revenue as of March 31, 2016, related to gains on sales of these loans.

The review began with discovery of a change in the application dates for $3.0 million of the loans described above, which was promptly remediated. The board also hired an outside expert firm to review all other loans facilitated in the first quarter of 2016 and the firm did not find changes to data in these or other Q1 loans.

The review further discovered another matter unrelated to the sale of the loans, involving a failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an investment in the same fund. This lack of disclosure had no impact on financial results for the first quarter.

Given the events above, the Company took, and will continue to take, remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016 -- one related to the sales of non-conforming loans and the other to the failure to disclose the personal investment interests -- and to restore the effectiveness of its disclosure controls and procedures. These remediation steps included the termination or resignation of three senior managers involved in the sales of the $22 million of near-prime loans.

119.   The May 9, 2016 press release essentially disclosed that LendingClub had intentionally falsified data concerning millions of dollars in loans, and that three senior managers had been involved in a $22 million sale of loans to an investor (who was later identified as the Jeffries Group), where the quality of loans LendingClub had provided was "in contravention of the investor's express instructions" regarding loan quality (it was later revealed that defendant Laplanche had not been candid during an inquiry into this fraudulent activity).

120.   The May 9, 2016 press release also revealed that one executive and one Board member (later revealed to be defendants Laplanche and Mack, respectively) had concealed their personal interests in a fund (later identified as Cirrix) that Laplanche had convinced LendingClub to invest in.

121.   On this news, the Company's stock plummeted from a close of $7.10 per share on May 6, 2016 to close at $4.62 per share on May 9, 2016, a loss of $2.48 per share, or approximately 35%, on unusually heavy volume of over 96 million shares.

122.   After this news began to emerge, analysts slashed their ratings and price targets for LendingClub.  According to the Securities Class Action, analysts covering LendingClub issued the following research reports:

- Compass Point Research & Trading, LLC issued a report on May 9, 2016, entitled "Risk Intensifies Following CEO Exit/Internal Probe; Reiterate Sell, PT to $4," which predicted that "many institutional investors will either pause in supplying capital and/or demand wider spreads from LendingClub near-term" and that LendingClub's disclosures would result in greater regulatory scrutiny.

- Guggenheim Securities, LLC issued a report that downgraded LendingClub, noting that "LC may lack a culture of compliance," and that "the disclosure of the series of control failures underscores [LendingClub's] need to improve its oversight and compliance related to internal control issues."

- Finally, Morgan Stanley Research issued a report that stated: "**CEO's departure likely to undermine the confidence of banks and other institutional investors**: CEO Renaud Laplanche and three unnamed executives resigned following an internal audit regarding improper allocation of $22mn of loans to an investor. The direct impact is limited – the $22mn were bought back and resold at par – but the bigger potential impact is clearly the reputational damage, which could ultimately be detrimental to LC's institutional funding. We've made the point in the past that LC's reputation and track record are key distinguishing attributes that would have kept it relatively insulated from the ebbs and flows of institutional demand across the broader marketplace lending industry. This is clearly a setback to that assertion."

123.   On May 16, 2016, the Company filed its quarterly report on Form 10-Q with the SEC (the "Q1 2016 10-Q"), which stated that, following the announcement on May 9, 2016 of the Board review, the Company received a grand jury subpoena from the U.S. Department of Justice and that the Company was under investigation.

124.   In the Q1 2016 10-Q, the Company stated that it "identified a material weakness in [LendingClub's] internal control over financial reporting" and that the material weakness allowed a "[l]ack of transparent communication and appropriate oversight" of dealings with the Company's investors.

125.   Under the section entitled "Evaluation of Disclosure Controls and Procedures," the Company admitted in the Q1 2016 10-Q that:

The identified material weakness is the result of the aggregation of control deficiencies related to the Company's "tone at the top," which manifested in three primary areas described further below. In addition, the Company has concluded that the material weakness identified as of March 31, 2016 also existed at the end of 2015 and therefore that its disclosure controls and procedures were ineffective and not operating at the reasonable assurance level as of December 31, 2015.

126.   Under the section entitled "Changes in Internal Control Over Financial Reporting," the Company admitted in the Q1 2016 10-Q that:

The control environment, which includes the Company's Code of Conduct and Ethics Policy, is the responsibility of senior management, and sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting. Although each area described below involved its own deficiencies, a significant contributing factor to all of the deficiencies aggregating to a material weakness was the Company's lack of an appropriate tone at the top set by certain members of senior management.

127.   The Q1 2016 10-Q also disclosed that the Company began "exploring ways to restore investor confidence in its platform," including using a "greater amount of its own capital to purchase loans on its platform…"  Thus, despite years of the Company telling the market that it was in the business of collecting fees by connecting borrowers and lenders and servicing loans, the Company now had to actually start purchasing loans in order to avoid the collapse of its marketplace.  As a result, the Company stated in the Q1 2016 10-Q that "[t]hese actions likely may have material adverse impacts on the Company's business, financial condition (including its liquidity), results of operations and ability to sustain and grow loan volume."

128.   In the Q1 2016 10-Q, LendingClub disclosed that its internal control over financial reporting was ineffective as of December 31, 2015, and likewise filed statements that there had been "no change" of those controls during the Relevant Period. Thus, defendants Laplanche and Dolan were aware or deliberately reckless in disregarding that the SOX Certifications they signed during the Relevant Period, which attested to the accuracy and completeness of the Company's financial statements and effective internal controls, were false, in light of the admitted material weakness in the Company's internal controls over financial reporting.

129.   LendingClub disclosed that, prior to December 31, 2015, it used LCA to purchase expiring LendingClub loans, even though doing so was outside the investment guidelines LCA had promised its investors.  Defendants Laplanche and Dolan, and LendingClub's General Counsel

comprised LCA's Investment Policy Committee and were responsible for managing LCA's portfolio of loans and verifying conformity with its investment guidelines.

130.   The Company disclosed that it took, and needed to continue to take, "remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016," which included the termination or resignation of three other senior managers. According to the Securities Class Action, the three senior managers who were fired or resigned were reportedly involved in loan sales at the Company and those individuals were: Jeff Bogan, who had worked at the Company since April 2012 and was the Company's Head of Investor Group; Adelina Grozdanova, who had worked at the Company since July 2013 and was Vice President, Head of Institutional Investors; and Matt Wierman, who left as a Senior Vice President and no later than 2013 was in charge of Product Performance at the Company. Bogan and Grozdanova had both come from Morgan Stanley and had helped prepare LendingClub for its IPO.

131.   LendingClub also disclosed that it had "a gap in preventative controls related to data management," and described "enhancements" that it was implementing to provide basic protection against manipulation in order to correct this defect, including:

- "Enhancing the testing of data changes prior to deployment based on the risk of the change";

- "Reviewing change requests for key data attributes, prior to implementation, by the Internal Audit Team";

- "Validating that change requests for key data attributes have been properly executed";

- "Expanding the number of data fields that are logged for the changes";

- "Monitoring logs for key changes";

- "Refreshing training/communication on data change management processes";

- "Enhancing the end-to-end testing framework"; and

- "Completing a consulting engagement on data change management with a Big Four accounting firm; implementing appropriate best practices."

132.   On May 16, 2016, *The Wall Street Journal* published an article entitled "LendingClub Discloses Justice Probe, Potential Shift in Business Model," which reported that LendingClub received

a criminal grand jury subpoena from the DOJ on May 9, 2016, and that the SEC also contacted the Company.

133.  On May 18, 2016, *The Wall Street Journal* published an article entitled "New York's Financial Regulator Subpoenas LendingClub," which reported that New York's Department of Financial Services had launched an inquiry into the business practices of LendingClub going back to 2013.

134.  According to the Securities Class Action, on May 25, 2016, Macquarie Research issued a report which stated that:

> LendingClub ('LC') has had a tumultuous few weeks, and investor confusion surrounding the shock resignation of its co-founder, Chairman, and CEO Renaud Laplanche due to improper loan sales and personal investment disclosures remains an overhang. These events raise questions around LC's internal controls, its culture, and the resiliency of marketplace lending models in general.

135.  On June 28, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing, among other things, that the Company named defendant Sanborn the CEO.

136.  Also on June 28, 2016, the Company announced that the Board subcommittee's review, previously disclosed in the Q1 2016 10-Q, identified more issues that necessitated additional review. In particular, the Company announced that adjustments that had been made to the valuation of six private investment funds (the "Funds") managed by LCA were not consistent with GAAP. As a result of the additional review, the Company announced that it would take certain further remedial measures.

137.  The Board's internal review also revealed that defendant Laplanche and his family had taken out thirty-two (32) loans on the Company's platform in December 2009 to boost the Company's volumes just four months prior to closing a round of venture capital funding prior to the IPO.

138.  On October 5, 2016, *Bloomberg* issued an article entitled, "SEC Investigates Founder's Role in LendingClub Buyback Plan."[7]  The article stated, in pertinent part:

---

[7] Matt Robinson and Noah Buhayar, *SEC Investigates Founder's Role in LendingClub Buyback Plan*, Bloomberg (Oct. 5, 2016), *available at* https://www.bloomberg.com/news/articles/2016-10-05/lendingclub-probe-said-to-review-buyback-as-laplanche-faced-loss.

Wall Street's top cop is scrutinizing **whether the founder of LendingClub Corp. advocated for the company to prop up its shares without telling the board about a possible conflict of interest**, according to people with knowledge of the matter.

As part of a broad investigation into the online lending platform, **the U.S. Securities and Exchange Commission is reviewing Renaud Laplanche's role in a $150 million share buyback approved in February**….Laplanche, who was chairman and chief executive officer at the time, had pledged some of his shares as collateral for a loan and was required to put up more money if the stock slid below a certain price, the people said.

While Laplanche ultimately sorted out his financial issues before the board approved the buyback, the SEC is still examining **whether he withheld information that other directors should have known about….**

\*        \*        \*

*Regulators Circling*

Regulators and prosecutors have been circling LendingClub since it shocked investors in May by announcing that Laplanche had resigned and that employees had falsified information on consumer loans the company arranged. SEC scrutiny of the share buyback adds to the agency's concerns that during his tenure running LendingClub, Laplanche didn't always keep the board in the loop on how his personal financial interests were entangled with the company's.

The SEC initially opened an investigation into San Francisco-based LendingClub to review the company's disclosures that dates on loans sold to Jefferies Group had been altered and that the board hadn't been informed of Laplanche's investment in a firm that posed a potential conflict. The probe has since expanded, the people said.

While LendingClub has disclosed some information on Laplanche's financial dealings, it has stopped short of providing a detailed chronology in its regulatory filings. Other public records reveal some of his moves as LendingClub's stock began falling late last year due to concerns that the company was having a harder time persuading investors to fund its loans.

In November, Laplanche purchased a property in Ross, California, through an entity called the Brant Point Trust. On Dec. 9, he transferred 4.47 million of his LendingClub shares to the trust. By Jan. 15, those shares had lost almost half their value and Laplanche was forced to refinance a personal loan, LendingClub later disclosed without specifying the circumstances of the debt.

*Mack Loan*

To avoid having to sell some of his shares to raise cash, Laplanche borrowed money from fellow director John Mack, the former chief executive officer of Morgan Stanley, according to a person familiar with the matter. The loan from Mack was secured by real estate. On Feb. 19, Laplanche received a $6.51 million mortgage on the Ross property from Morgan Stanley Private Bank as a trustee of the Brant Point Trust, according to public records.

Mack declined to comment on the loan to Laplanche.

The buyback, announced Feb. 11, was a swift reversal in strategy for LendingClub. In late 2014, it had raised $1 billion in an initial public offering, becoming the first in its industry to list shares on the New York Stock Exchange. After the company said it

would repurchase shares, the stock price rose 43 percent in the following seven trading days.

As it turns out, the share rally didn't help Laplanche. That's because the demand that he put up money to support the shares he had pledged as collateral came in January and the stock price didn't increase as much as he would have needed, according to a person with direct knowledge of the matter.

In addition, LendingClub was barred at the time from repurchasing shares until its next earnings report, the person said. Regardless, when LendingClub did announce its plans to buy back stock in February, Laplanche had already sorted out his financial situation by borrowing money from Mack, the person said.

Still, the SEC is examining whether he failed to inform the board of a conflict at the time directors were discussing the buyback, a potential violation of securities laws, said the people familiar with the agency's investigation.

*New Policy*

In April, LendingClub disclosed a new policy that requires executives to get approval from its general counsel and inform the board's audit committee before pledging LendingClub securities as collateral for a loan or holding them in a margin account.

The board review that led to Laplanche's exit also turned up another potential conflict that the former CEO failed to disclose. Earlier this year, he suggested the company invest $10 million with Cirrix Capital, an asset manager that buys LendingClub loans. A board committee approved the idea, but not all of the directors who reviewed it were aware that Laplanche had a personal stake in the fund. The disclosure was included in LendingClub's proxy statement in April, after the investment had been made.

***LendingClub's issues began in April when the board began an internal review after it learned that application dates had been changed on $3 million of loans sold to Jefferies. The probe eventually found that $22 million of debts bought by the investment bank didn't meet its criteria. LendingClub repurchased the loans and sold them to another investor.***

139.   On August 8, 2016, the Company issued a press release in which LendingClub announced several changes in leadership, including the resignation of defendant Dolan as the Company's CFO.  However, also on August 8, 2016, based on an interview of defendant Sanborn, *Bloomberg* reported that defendant Dolan had informed defendant Sanborn earlier that year that Dolan intended to resign earlier, but that Sanborn asked her to stay with on with LendingClub following defendant Laplanche's exit.

140.   After agreeing to stay with LendingClub for some time following defendant Laplanche's exit, between November 3, 2015 and December 14, 2015, Dolan sold 135,000 shares of LendingClub stock for proceeds of over $1.8 million.

141.   The Company has since taken some remediation efforts, including remedial efforts to prevent the alteration of information on live Company databases.  The Company has also hired an outside consulting firm to support data change management processes in order to prevent additional falsification of loan documentation.

### The Court Denies, in Part, Claims Against Certain
### of the Director Defendants in the Securities Class Action

142.   On December 9, 2016, lead plaintiff in the Securities Class Action filed a consolidated complaint alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").  In particular, lead plaintiff in the Securities Class Action alleged violations of Section 11 of the Securities Act against Director Defendants Ciporin, Crowe, Lynn, Mack, Meeker, Morris, Summers and Williams (the "Securities Class Action Director Defendants").  As such, a majority (seven out of nine current Board members) of the current Board of Directors of LendingClub were alleged to have violated Section 11 of the Securities Act in the Securities Class Action.  The contemporaneously named director defendants in both the Securities Class Action and the above-captioned shareholder derivative action include director defendants: Ciporin, Crowe, Mack, Meeker, Morris, Summers and Williams.

143.   On May 25, 2017, the Court in the Securities Class Action denied the Securities Class Action Director Defendants motion to dismiss the Section 11 claims. *See In re LENDINGCLUB SECURITIES LITIGATION*, Case No. 3:16-cv-02627-WHA (N.D. Cal. May 25, 2017) (ORDER) (Dkt. No. 181) (the "MTD Order").  In particular, the Court in the Securities Class Action allowed the following claims to survive against the Securities Class Action Director Defendants: (1) claims that the Securities Class Action Director Defendants misrepresented the adequacy of LendingClub's internal controls over financial reporting (MTD Order at 12); (2) claims that the Securities Class Action Director Defendants failed to disclose the Company's relationship with Cirrix, including that "millions of dollars of loans were not the result of organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly neutral platform, but were inflated artificially through self-dealing" (MTD Order at 14); and (3) claims that the Securities Class Action Director Defendants

misrepresented the Company's data integrity and security protocols in its registration statement for the IPO (MTD Order at 15).

## DAMAGES TO THE COMPANY

144.   LendingClub has been, and will continue to be, severely damaged and injured by the defendants' misconduct.  As a direct and proximate result of the defendants' conduct, LendingClub has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

  a.   costs incurred in compensation and benefits paid to defendants that violated federal securities laws;

  b.   costs incurred defending against SEC, DOJ, CFTC and other government investigations and litigation;

  c.   substantial loss of market capital;

  d.   costs already incurred and to be incurred defending the pending securities fraud class action lawsuit pending before this Court captioned *In re LENDINGCLUB SECURITIES LITIGATION*, Case No. 3:16-cv-02627-WHA (N.D. Cal.); and

  e.   any fines or other liability resulting from the Company's violations of federal law.

145.   In addition, LendingClub's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

146.   The wrongdoing complained of herein has irreparably damaged LendingClub's corporate image and goodwill.  For at least the foreseeable future, LendingClub will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that LendingClub's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

147.   As a result of Defendants' materially false and misleading statements and failures to disclose, LendingClub public stock traded at artificially inflated prices during the Relevant Period.

148.   During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Defendants took advantage of the artificially inflated prices to sell their LendingClub shares for substantial proceeds. Specifically, as detailed below, the Insider Selling

Defendants (including defendants Ciporin, Crowe, Meeker, and Summers, *i.e.*, half of the current Board) sold more than $41 million of personally held or controlled common stock.

149.   Defendant Dolan was the Company's CFO during the Relevant Period and was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings.  While in possession of this information, defendant Dolan sold approximately 135,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $1.8 million. Defendant Dolan's sales were timed to maximize profits from the Company's then artificially inflated stock price.

150.   Defendant Sanborn was the Company's Chief Operating and Marketing Officer during the Relevant Period and the current CEO of the Company.  Defendant Sanborn was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings.  While in possession of this information, defendant Sanborn sold at least 245,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $3 million. Defendant Sanborn's sales were timed to maximize profits from the Company's then artificially inflated stock price.

151.   Defendant Ciporin was a member of the Company's Board during the Relevant Period and was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings. While in possession of this information, defendant Ciporin sold at least 2,700 personally held shares of LendingClub stock at artificially inflated prices for proceeds of more than $40,000.  Moreover, by virtue of his position with Canaan Partners, an affiliate and/or parent of Canaan VII L.P. and Canaan Management, Inc., defendant Ciporin controlled the insider sales by these entities for proceeds of more than $51 million.  Defendant Ciporin's sales were timed to maximize profits from the Company's then artificially inflated stock price.

152.   Defendant Crowe was a member of the Company's Board during the Relevant Period and was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings. While in possession of this information, defendant Crowe sold at least 7,023 personally held shares of LendingClub stock at artificially inflated prices for proceeds of approximately $95,723. Defendant Crowe's sales were timed to maximize profits from the Company's then artificially inflated stock price.

153.   Defendant Meeker was a member of the Company's Board during the Relevant Period and was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings. While in possession of this information, defendant Meeker sold at least 2.3 million personally held shares of LendingClub stock at artificially inflated prices for proceeds of approximately $34.5 million. Defendant Meeker's sales were timed to maximize profits from the Company's then artificially inflated stock price.

154.   Defendant Summers was a member of the Company's Board during the Relevant Period and was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings. While in possession of this information, defendant Summers sold at least 123,284 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $1.6 million. Defendant Summers' sales were timed to maximize profits from the Company's then artificially inflated stock price.

155.   These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein. The Insider Selling Defendants' sales during the Relevant Period include the following:

| DEFENDANT | DATE | # SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| Carrie Dolan | 11/03/2015 | 31,243 | $15.00 | $468,645 |
| | 12/14/2015 | 25,830 | $13.20 | $340,956 |
| | 12/14/2015 | 77,927 | $13.22 | $1,030,195 |
| | | **135,000** | | **$1,839,796** |
| | | | | |
| Scott Sanborn | 08/06/2015 | 35,000 | $13.80 | $483,000 |
| | 09/08/2015 | 35,000 | $12.36 | $432,600 |
| | 10/06/2015 | 35,000 | $13.84 | $484,400 |
| | 11/06/2015 | 35,000 | $14.41 | $504,350 |
| | 12/07/2015 | 35,000 | $13.16 | $460,600 |
| | 01/06/2016 | 70,000 | $10.30 | $721,000 |
| | | **245,000** | | **$3,085,950** |
| | | | | |
| Daniel Ciporin | 11/03/2015 | 2,700 | $15.00 | $40,500 |
| | | **2,700** | | **$40,500** |
| | | | | |
| Jeffrey Crowe | 08/14/2015 | 7,023 | $13.63 | $95,723 |
| | | **7,023** | | **$95,723** |
| | | | | |
| Mary Meeker | 12/16/2015 | 2,300,000 | $15.00 | $34,500,000 |
| | | **2,300,000** | | **34,500,000** |
| | | | | |
| Lawrence Summers | 09/30/2015 | 23,421 | $13.29 | $311,265 |
| | 10/05/2015 | 10,000 | $14.00 | $140,000 |
| | 10/15/2015 | 23,421 | $14.53 | $340,307 |
| | 11/03/2015 | 19,600 | $15.00 | $294,000 |
| | 11/16/2015 | 23,421 | $12.61 | $295,339 |
| | 12/15/2015 | 23,421 | $12.6 | $295,573 |
| | | **123,284** | | **$1,676,484** |
| | | | | |
| *TOTAL:* | | *2,813,007* | | *$41,238,453* |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

156.   Plaintiff brings this action derivatively in the right and for the benefit of LendingClub to redress injuries suffered, and to be suffered, by LendingClub as a direct result of violations of federal securities laws by the Director Defendants.  LendingClub is named as a nominal defendant solely in a

derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

157.   The Board of LendingClub, at the time this action was commenced, consisted of the following nine individuals: Director Defendants Sanborn, Morris, Mack, Meeker, Summers, Williams, Ciporin, Crowe and Mayopoulos.

158.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the LendingClub Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

**Demand is Futile as to Defendant Sanborn Because His**

**Principal Professional Occupation is as the Company's President and CEO**

159.   Defendant Sanborn has been a director, President and CEO of the Company since 2016. In his role as President and CEO of the Company for the fiscal year ended December 31, 2016, defendant Sanborn received $11,361,139 in total compensation.  The Company does not claim that defendant Sanborn is an independent director.  Because defendant Sanborn's primary source of income and primary employment is his employment as President and CEO of LendingClub and his professional reputation is inextricably bound to his role at LendingClub, defendant Sanborn is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Insider Selling Defendants**

160.   Demand is futile as to Director Defendants Meeker, Summers, Ciporin, and Crowe because, as alleged herein, each engaged in insider trading activity at a time when each of them knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to shareholders.

161.   On the basis of this non-public information, defendants Meeker, Summers, Ciporin, and Crowe timed their sales to maximize profit from LendingClub's then artificially inflated stock price.

162.   As a result of these illicit insider sales, defendants Meeker, Summers, Ciporin, and Crowe each received direct financial benefits not shared with LendingClub shareholders, and are

therefore each directly interested in a demand. Further, defendants Meeker, Summers, Ciporin, and Crowe each are interested in a demand because they face a substantial likelihood of liability for their violations of federal securities laws based on their challenged insider sales. As such, demand upon defendants Meeker, Summers, Ciporin, and Crowe is futile.

<b><u>Demand is Futile as to Defendant Mack</u></b>

163.   Demand is futile as to defendant Mack because defendant Mack is not disinterested or independent from defendant Laplanche.

164.   On May 9, 2016, the Company disclosed defendant Laplanche's "failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an investment in the same fund."  Defendant Laplanche had failed to fully disclose a personal interest he held in Cirrix while the Company was contemplating investing in the fund – an investment that Laplanche had proposed to the Risk Committee – and defendant Mack also held an undisclosed interest in Cirrix.

165.   Additionally, LendingClub disclosed that its Risk Committee approved an investment by LendingClub itself into Cirrix – without knowledge of Laplanche and Mack's prior investment. Combined, the Company, Laplanche, and Mack owned at least 31% of Cirrix, and Cirrix has reportedly invested over $175 million into notes sold on the Company's platform.  Laplanche's and Mack's personal investments in Cirrix were a blatant conflict of interest of which the Board knew or should have known about prior to the Company's investment in Cirrix, yet both Laplanche and Mack failed to disclose their interests in Cirrix.

166.   Defendant Mack did not disclose his interest in a key buyer of Lending Club loans, despite the fact that it was Defendant Mack who initiated the LendingClub – Cirrix connection and Laplanche investment in the first place.   Mack was introduced to Cirrix by Arthur J. Samberg, a former colleague of Mack's at Pequot Capital Management (which Samberg ultimately closed down after agreeing to pay $28 million to settle fraud allegations).  Samberg introduced Mack to Andrew Hallowell, head of Arcadia Funds LLC, the manager of Cirrix Capital, and the Lending Club – Cirrix and Laplanche/Mack – Cirrix relationships unfolded from the initial Mack contact.

167.   Further, in January 2016, as reported by *Bloomberg*, defendant Mack provided defendant Laplanche with "an old-fashioned version of a peer-to-peer loan," which amounted to a private bailout to Laplanche.  As *Bloomberg* reported, "[a]s a stopgap measure, Laplanche borrowed money from Mack, according to a person familiar with the matter, who asked not to be identified discussing the transaction. Morgan Stanley later provided a mortgage to Laplanche, property records show."

168.   Following this personal bailout, Morgan Stanley, the firm for which Mack retains the title of Chairman Emeritus, provided a mortgage to Laplanche.  Without this financial bailout by Mack and Morgan Stanley, Laplanche would have been forced to sell part of his stake in the Company.

## Demand is Futile as to all the Director Defendants

169.   Although Company founder Laplanche was forced out as CEO and director in May 2016, after his non-disclosed interest in Cirrix was made to the Director Defendants, the Board took no action against Defendant Mack, who had an 8% non-disclosed limited partnership stake in Cirrix (precisely the same interest owned by Laplanche).

170.   Defendant Mack did not disclose his interest in Cirrix to the Board.  None the less, Mr. Mack remains on the Board and the Director Defendants have taken no action against him.

171.   By failing to take action against Defendant Mack and leaving Mack on the Board, when Defendant Mack engaged in the same misconduct as Laplanche, the Director Defendants have demonstrated that they are not impartial in connection with the wrongdoing that is the subject of the present action.

172.   Additionally, all the Director Defendants failed to take legal action against those who were responsible for permitting LendingClub to function without effective internal controls during the period when the Company filed misleading statements with the SEC.  While the Director Defendants permitted defendant Laplanche to leave the Company without full and truthful disclosure of his wrongdoing at LendingClub, they failed to clawback previously paid bonus compensation and/or salary.  The Director Defendants failed to improve the same defective internal controls after the departure of defendant Laplanche even though when he left the Company they could not have been unaware that the controls were deficient.  Moreover, the Director Defendants attempted to deny the serious problems that occurred throughout the Relevant Period and did not seek to make corporate

governance changes or hold necessary parties responsible.  Thus, demand on the Board is futile and therefore excused.

**Demand is Futile as to Defendants Mack, Meeker and Summer**

173.  Demand is futile as to defendant Meeker because defendant Meeker has significant business and social ties with defendant Mack, rendering them unable to objectively and disinterestedly consider bringing the claims set forth herein against each other.

174.  Defendants Mack and Meeker were employed together for nearly twenty years at Morgan Stanley from 1991 through 2010.  Defendant Mack, as Morgan Stanley's CEO and Chairman was defendant Meeker's former boss and is the party who introduced defendant Meeker to LendingClub.  Due to these longstanding and current professional ties, defendants Mack and Meeker cannot and will not objectively and disinterestedly consider a demand to bring claims against each other as set forth herein.

175.  Demand is also futile as to defendant Summers because defendant Summers and defendant Meeker share a joint membership on the board of directors of Square Inc., a company developing and providing electronic payment services.  Both defendants Summers and Meeker became directors of Square Inc. in 2011.  As such, defendants Meeker and Summers cannot independently consider demand to bring the claims set forth herein against each other and demand is futile as to those defendants.

**Demand is Futile as to Defendant Crowe**

176.  Defendant Crowe is the managing partner of Norwest Venture Partners, an investment firm. As a principal in Norwest Venture Partners, defendant Crowe has interests that are not aligned with public shareholders of LendingClub. Instead, defendant Crowe's longtime interests have lain with Norwest Venture Partners—specifically, its objective to monetize (and liquidate) its investments in LendingClub as expeditiously and profitably as possible, including following the IPO.

177.  The general partner of Norwest Venture Partners X, L.P. is Genesis VC Partners X, LLC. The managing member of Genesis VC Partners X, LLC is NVP Associates, LLC. Crowe, along with Promod Haque and Matthew Howard, are officers of NVP Associates, LLC. Each of these individuals has shared voting and investment power over the shares held by Norwest Venture Partners X, L.P.

178.   Indeed, Norwest Venture Partners has dramatically decreased its holdings of the Company's stock following the IPO. As of February 17, 2015, Norwest Venture Partners X, L.P. held 50,822,020 shares of the Company. As of March 31, 2016, Norwest Venture Partners X, L.P. had reduced its holdings to only 12,822,020 shares.

**Demand is Futile as to the Members of the Risk Committee**

179.   Pursuant to the Company's Risk Committee Charter,[8] defendants Ciporin, Morris, Summers and Williams (the "Risk Committee Defendants"), were required to, among other things, as a qualification of membership on the Risk committee, be "free from any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a Committee member."

180.   Pursuant to the Risk Committee Charter, the Risk Committee Defendants purpose and responsibilities and duties included, among other things:

> The purpose of the Risk Committee…is to assist the Board in its oversight of the Company's management of key risks, including credit, technology/security, strategic, legal and compliance and operational risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks.  The chairman of the Committee shall coordinate with the chairman of the Audit Committee to assist the Audit Committee in its review of the Company's risks that have been delegated to the Audit Committee in its charter. The chairman of the committee shall also coordinate with the chairman of the Compensation Committee to assist the Compensation Committee in its consideration of the relationship between risk management policies and practices, corporate strategy and senior executive compensation. The Committee's principal functions are to:
> - provide oversight of the Company's risk management structure;
> - provide oversight of the Company's risk management and risk assessment guidelines and policies regarding credit, operational, technology, security, legal and compliance risk and such other risks as appropriate;
> - provide input and support of the Company's analysis of its risk management structure and entity wide risk tolerance; and
> - monitor the Company's enterprise risk management plan and monitor and evaluate the performance of the Company's risk management function.

181.   According to the 2016 Proxy, the role and duties of the Risk Committee included the following:

---

[8] *See* Charter of the Risk Committee of the Board of Directors of LendingClub Corporation (as approved September 22, 2016), *available at* http://ir.lendingclub.com/Cache/1001215070.PDF?Y=&O=PDF&D=&FID=1001215070&T=& IID=4213397.

Our Risk Committee assists our Board of Directors in its oversight of our key risks, including credit, technology and security, strategic, legal and compliance and operational risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks. The Risk Committee also assists our Audit and Compensation Committees in the review and assessment of risks in those areas.

*       *       *

The members of our Risk Committee are Daniel Ciporin, John C. (Hans) Morris (chair), Lawrence Summers and Simon Williams.

Our Risk Committee assists our Board of Directors in its oversight of our key risks, including credit, technology and security, strategic, legal, regulatory (other than related to our financial statements) and compliance and operational risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks. The chair of our Risk Committee assists our Audit Committee in its review of the risks that have been delegated to our Audit Committee in its charter.

During 2015, our Risk Committee held five meetings.

182.   Despite these duties, the Risk Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and approving an investment by LendingClub into Cirrix, a fund that purchases LendingClub loans despite the Company's statement that "[o]ur business model is not dependent on using our balance sheet and assuming credit risk for loans facilitated by our marketplace."

183.   The 2016 Proxy also contains a section entitled "Related Party Transaction," which, for the first time, revealed that both defendants Laplanche and Mack owned limited partner interests in a holding company that, in turn, participated in a family of funds that invested in LendingClub.  Further, the 2016 Proxy disclosed that, not only did LendingClub invest $10 million for a 15% interest in the holding company sometime in 2016, but also that the Risk Committee had actually "reviewed and approved" this investment.

184.   Although the 2016 Proxy does not identify Arcadia or Cirrix, it became clear that the related-party transaction described in the 2016 Proxy involved Arcadia and Cirrix:

At December 31, 2015, Mr. Laplanche and Mr. Mack owned approximately 2% and 10%, respectively, of limited partnership interests in a holding company that participates in a family of funds with other unrelated third parties, which purchase whole loans and interests in whole loans from the Company. During the year ended December 31, 2015, this family of funds purchased $139.6 million of whole loans and $34.9 million of interests in whole loans. During the year ended December 31, 2015, the Company earned $636,000 in servicing fees and $357,000 in management fees from this family of funds, and paid interest of $7.4 million to the family of funds. The sales of whole loans and interests in whole loans, and the servicing and management fees

charged were on terms and conditions that were not more favorable than those obtained by other third-party investors.

Subsequent to December 31, 2015, the Company invested $10 million for an approximate 15% limited partnership interest in the holding company and Mr. Laplanche invested an additional $4.0 million for an approximate 8% limited partnership interest in the holding company. The Risk Committee reviewed and approved the investment of $10 million in the holding company. As of close of business April 1, 2016, the Company, Mr. Laplanche and Mr. Mack owned approximately 31% of limited partnership interests in the holding company.

185.   Cirrix purchased packages of loans from LendingClub, which, in turn, invested in Cirrix, essentially repurchasing its own risk.

186.   The Company reported in its SEC Form 10-Q for the quarterly period ended March 31, 2016, that, "In addition, in March 2016 the risk committee approved an investment by the Company in Cirrix Capital, L.P. without all committee members being aware of the prior investments by the former CEO and the board member."  The Company thereby indicated that some of the members of the Risk Committee were aware of the Laplanche and Mack's undisclosed interests in Cirrix and approved the purchase none the less.

187.   Given the Company's failure to identify which Risk Committee members knew and which did not know of Laplanche and Mack's interests in Cirrix, for purposes of demand futility it is assumed that a majority of the Risk Committee knew of the conflict.

188.   Accordingly, the Risk Committee Defendants face a sufficiently substantial likelihood of liability and any demand upon the Risk Committee Defendants is futile and therefore excused.

**Demand is Futile as to the Members of the Audit Committee**

189.   Pursuant to the Company's Audit Committee Charter,[9] defendants Williams, Ciporin, Crowe and Mayopoulos (the "Audit Committee Defendants"), were responsible for the oversight of the accounting, financial reporting processes, and financial statements of Company.

190.   Pursuant to the Audit Committee Charter, the Audit Committee Defendants' responsibilities are as follows:

---

[9] *See* Charter of the Audit Committee of the Board of Directors of LendingClub Corporation (effective December 15, 2016) (the "Audit Committee Charter"), *available at* http://ir.lendingclub.com/Cache/1500094264.PDF?Y=&O=PDF&D=&fid=1500094264&T=&iid=4213397.

The purpose of the Audit Committee…is to assist the Board in fulfilling its statutory and fiduciary oversight responsibilities relating to the Company's financial accounting, reporting and controls.  The Committee's principal functions are to:

- oversee the integrity of accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;

- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes, procedures, and systems of controls (internal and disclosure) that are conducted by the Company's independent auditor and the Company's financial and senior management;

- monitor the Company's internal audit plan and monitor and evaluate the performance of the Company's internal audit function;

- select, and, if necessary, terminate the Company's independent auditor;

- review and evaluate the qualifications, independence, and performance of the Company's independent auditor;

- oversee the Company's systems of controls (internal and disclosure)

- review the Company's process for monitoring compliance with laws and regulations affecting financial reporting; and

- facilitate communication among the Company's independent auditor, the Company's financial and senior management and the Board.

191.  According to the Company's 2016 Proxy:

Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including related policies and procedures. Our Audit Committee also reviews our process for monitoring compliance with laws and regulations affecting financial reporting and oversees our internal audit function.

192.  Moreover, it was the policy and practice of LendingClub's Audit Committee to review SEC filings and press releases before their issuance.  As a result, LendingClub's Audit Committee knew that in the 2015 and 2016 Proxy Statements, the Company failed to disclose the material information described above as well as the omissions in the Company's other financial statements. The Audit Committee Defendants knew of or recklessly disregarded the wrongdoing complained of herein in the normal course of performing their duties.  However, the Audit Committee Defendants violated federal securities law by allowing the misleading disclosures described herein.  As a result, demand is excused as to Williams, Ciporin, Crowe and Mayopoulos.

**Demand is Futile as to the Members of the Compensation Committee**

193.   LendingClub's Compensation Committee was comprised of defendants Mack, Ciporin and Crowe (the "Compensation Committee Defendants") during the Relevant Period.  Pursuant to LendingClub's Compensation Committee Charter,[10] the "purpose of the Compensation Committee…is to assist the Board with respect to compensation matters, including evaluating, recommending, approving and reviewing executive officer and director compensation arrangements (except with respect to equity-based incentive compensation awarded to such executive officers and directors, as set forth below in Section III), plans, policies and programs maintained by the Company, and administering the Company's cash-based and equity-based compensation plans."

194.   With respect to cash-based and equity based compensation for the Company's employee-directors, the Compensation Committee specifically is given the charge that it "review and approve…all cash-based and equity based incentive compensation…after taking into consideration the Company's strategies with respect to cash-based and equity-based compensation."

195.   The Compensation Committee Defendants presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and approving executive officers' and directors' continued and excessive compensation.  In so doing, any demand upon the Compensation Committee Defendants is futile, and therefore excused.

**Additional Reason for Demand Futility**

196.   LendingClub's officers and directors are protected against personal liability for their acts of mismanagement and violations of federal securities law alleged in herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of LendingClub.  Upon information and belief, however, there have been certain changes in the language of directors' and officers' liability insurance policies in the past few years and the directors' and officers' liability insurance policies covering the

---

[10] *See* LendingClub Corporation Charter of the Compensation Committee of the Board of Directors (as adopted November 15, 2016) (the "Compensation Committee Charter"), *available at* http://ir.lendingclub.com/Cache/1500093894.PDF?Y=&O=PDF&D=&FID=1500093894&T=&IID=4213397.

Defendants in this case contain provisions that eliminate coverage for any action brought directly by LendingClub against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of LendingClub, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.  On the other hand, such insurance coverage exists for this action, which is brought derivatively, and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I

### Against all Defendants for Violations of Section 14(a) of the
### Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

197.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2015 and 2016 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants as detailed above, and included by reference materially false and misleading financial statements.

199.   The 2015 Proxy Statement was false and misleading because it contained a section entitled "Related Party Transactions," which purports to disclose all related party transactions, but did not disclose that both defendants Laplanche and Mack owned interests in Cirrix, and that therefore LendingClub's sales of loans took place inorganically and that LendingClub took on a significant credit risk on Cirrix's behalf in the form of a credit-support agreement.  This failure to disclose the related-party transaction in the 2015 Proxy Statement constituted a representation that there were no related party transactions other than those disclosed, which is false.  Further, the failure to disclose the above related-party transaction rendered false LendingClub's reported loan originations, loan

originations growth, revenues/fees, and EPS since they all included undisclosed related-party transactions with Cirrix Capital, L.P. ("Cirrix"), which acquired $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.

200.   The 2015 and 2016 Proxy Statements were false and misleading because the Company represented that bonuses were paid because the Company had met financial and operational goals, when in fact the Company did not actually meet the "financial and operational goals" and purported successful "performance" that caused Defendants to issue the above-described awards to certain of the Defendants and/or other members of the Company's management.  The Company's purported performance was based on results reported by Defendants as a result of the Company's deficient internal controls.  The Company's inadequate internal controls allowed Defendants to cause the Company's financial statements to contain false and misleading statements concerning, among other things, reported loan originations, loan originations growth, revenues/fees, and EPS due to undisclosed related-party transactions with Cirrix; that LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and that LendingClub engaged in undisclosed related-party transactions, sell nonconforming loans to investors, backdate loan applications, which rendered inaccurate the Company's financial reporting.

201.   The 2015 and 2016 Proxy Statements falsely represent that the Board and Audit Committee oversaw and maintained accurate financial reporting and practices when in fact undisclosed weaknesses in LendingClub's internal controls meant that defendant Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell nonconforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

202.   The 2016 Proxy Statement was false and misleading because it represented that, "[t]he sales of whole loans and interests in whole loans, and the servicing and management fees charged were on terms and conditions that were not more favorable than those obtained by other third-party investors," when in fact LendingClub took on a significant credit risk on Cirrix's behalf in the form of a credit-support agreement.

203.  The 2016 Proxy Statement was also false and misleading in that it represented that the Risk Committee had approved the Company's investment in Cirrix, as if the Risk Committee had done so with full knowledge of the concealed and undisclosed investments in Cirrix by Laplanch and Mack. The 2016 Proxy Statement states, in pertinent part:

> Subsequent to December 31, 2015, the Company invested $10 million for an approximate 15% limited partnership interest in the holding company and Mr. Laplanche invested an additional $4.0 million for an approximate 8% limited partnership interest in the holding company. The Risk Committee reviewed and approved the investment of $10 million in the holding company. As of close of business April 1, 2016, the Company, Mr. Laplanche and Mr. Mack owned approximately 31% of limited partnership interests in the holding company.

204.  The 2016 Proxy Statement's above partial disclosure was false and misleading in its failure to disclose defendants Laplanche's and Mack's interest in Cirrix, which was the only LendingClub loan investor that had access to all of the Company's loan programs, including private, public and small business loans.  Further, the 2016 Proxy Statement failed to disclose that LendingClub also provided Cirrix with a credit-support agreement pursuant to which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).

205.  In the exercise of reasonable care, defendants should have known that the 2015 and 2016 Proxy Statements contained misleading information and/or omitted material information.

206.  The misrepresentations and omissions in the 2015 and 2016 Proxy Statements were material to Company shareholders in voting on the 2015 and 2016 Proxy Statements.

207.  The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2015 and 2016 Proxy Statements.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of LendingClub and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to LendingClub the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

C.      Directing LendingClub and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LendingClub and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

      1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.   a provision to permit the shareholders of LendingClub to nominate at least three candidates for election to the Board; and

      3.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

D.      Determining and awarding to LendingClub exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.      Awarding LendingClub restitution from defendants, and each of them;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:      November 6, 2017

**REICH RADCLIFFE & HOOVER LLP**
By: /s/ Adam T. Hoover
Adam T. Hoover

**LIFSHITZ & MILLER**
Edward Miller
Attorneys for Plaintiff

**<u>VERIFICATION</u>**

I, Jeremy Sawyer hereby declare as follows:

     I am shareholder of LC and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 10/04/2017

                                             Signature